No. 23-2135

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**KENNETH FITCH,** *et al.***,**

*Plaintiffs-Appellants*,

**v.**

**STATE OF MARYLAND,** *et al.***,**

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Maryland
(Peter J. Messitte, District Judge)

_____

**BRIEF OF APPELLEES**

_____

ANTHONY G. BROWN
Attorney General of Maryland

RYAN R. DIETRICH
Assistant Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7648
rdietrich@oag.state.md.us

February 7, 2024                    Attorneys for Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-2135__    Caption: __Fitch v. State of Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__State of Maryland, Governor Wes Moore, Secretary Helen T. Grady__
(name of party/amicus)

_____

who is _____appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Ryan R. Dietrich _____     Date: _____10/31/2023_____

Counsel for: Appellees _____

Print to PDF for Filing

# TABLE OF CONTENTS

Page

ISSUE PRESENTED FOR REVIEW ........................................................2

STATEMENT OF THE CASE ...............................................................2

    Maryland's State Employee and Retiree Health and Welfare Benefits
        Program ..........................................................................2

    Congress Enacts Medicare Part D and Federally Financed Retiree
        Prescription-Drug Benefits, but with the "Doughnut Hole" ................5

    Maryland General Assembly Reacts to the Passage of Medicare Part D
        ...................................................................................6

    Congress Enacts the Affordable Care Act, Which Closes the "Doughnut
        Hole" by 2020 ..................................................................7

    Facing "Unsustainable" Growth of Its Employee and Retiree Benefits
        Costs, Maryland Considers Benefits Reform .......................7

    With the "Doughnut Hole" Closing, the General Assembly Enacts
        Legislation to Transition Retirees to Federally Provided
        Prescription-Drug Benefits...............................................11

    The Federal Government Accelerates the Closing of the "Doughnut
        Hole," and the State Follows Suit .....................................12

    The Fitch Plaintiffs File Suit, and the District Court Enjoins the State's
        Plan to Discontinue Retiree Prescription-Drug Benefits ..................12

    Maryland Enacts Legislation Supplementing Retiree Prescription-Drug
        Benefits Available Under Medicare Part D .......................13

    AFSCME Intervenes in the Litigation.............................................15

    The District Court's Initial Decision on the State Law Breach of
        Contract Claims...............................................................15

        Active Employees.................................................................16

Employees Who Retired on or Before June 30, 2011 .........................17

Employees Who Retired Between July 1, 2011, and December 31, 2018.................................................................................17

Employees Who Retired on or After January 1, 2019 .......................18

State Permitted to Show Reasonable Modification to Contractual Rights ...............................................................................18

The District Court's Decision on the Takings Clause Claims .....................19

This Court's Decision in *AFSCME Md. Council 3 v. State of Maryland* ......................................................................................19

Post-*AFSCME* Proceedings in the District Court .........................................21

SUMMARY OF ARGUMENT.................................................................24

ARGUMENT ...........................................................................................25

I.   THE STANDARD OF REVIEW IS DE NOVO.......................................25

II.  THIS COURT SHOULD DECLINE TO REVISIT ITS DECISION IN *AFSCME MD. COUNCIL 3 V. MARYLAND*, 61 F.4TH 143 (2023), WHICH IS CONTROLLING IN THIS CASE. ..........................................................25

     A.   This Court in *AFSCME* Evaluated—and Rejected—the Existence of a Contract Using Principles of Maryland Law...............26

     B.   The Fitch Plaintiffs' Claim of a Dispute of Material Fact is Illusory in Nature, and in Any Event Relates to a Claim Not Properly Before this Court. ...............................................29

     C.   To the Extent the Issue is Before This Court, the 2019 Laws Are Constitutional. ......................................................................31

     D.   The Fitch Plaintiffs' Attempt to Revisit the Scope of this Court's Review in *AFSCME* Should be Rejected. ...........................................33

CONCLUSION ........................................................................................34

REQUEST FOR ORAL ARGUMENT ....................................................35

CERTIFICATE OF COMPLIANCE ........................................................................35

# TABLE OF AUTHORITIES

Page

**Cases**

*AFSCME Maryland Council 3 v. Maryland*, 61 F.4th 143 (2023) .................. passim

*Bellon v. PPG Emp. Life & Other Benefits Plan*, 41 F.4th 244
     (4th Cir. 2022) ...................................................................................... 25

*Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366,
     (4th Cir. 2014) ................................................................................. 16, 19

*City of Frederick v. Quinn*, 35 Md. App. 626 (1977) ..................................... 18, 32

*Constantine v. Rectors & Visitors of George Mason Univ.*,
     411 F.3d 474 (4th Cir. 2005) ................................................................. 31

*Pense v. Maryland Dep't of Pub. Safety & Corr. Servs.*,
     926 F.3d 97 (4th Cir. 2019) ................................................................... 31

*Planned Parenthood S. Atl. v. Kerr*, 27 F.4th 945 (4th Cir. 2022) .................. 26, 33

**Statutes**

1966 Md. Laws ch. 660 ...................................................................................... 2

1984 Md. Laws ch. 290 ................................................................................... 2, 3

1993 Md. Laws ch. 10 ...................................................................................... 3, 4

1996 Md. Laws ch. 347 ..................................................................................... 4

2004 Md. Laws ch. 296 ..................................................................................... 6

2011 Md. Laws ch. 397 ................................................................................. 11, 17

2018 Md. Laws ch. 10 ....................................................................................... 12

2019 Md. Laws ch. 767 ......................................................................... 13, 14, 18, 21

42 U.S.C. § 1395w-114A .................................................................................. 12

Md. Ann. Code art. 64A, § 48 ........................................................................... 2

Md. Ann. Code art. 64A, § 48B(c)(1)..........................................................3

Md. Code Ann., State Pers. & Pens. § 2-508 (LexisNexis 2015).......... 16, 20, 26, 28

Md. Code Ann., State Pers. & Pens. § 2-508(b)(4) (LexisNexis 2015) ....................3

Md. Code Ann., State Pers. & Pens. § 2-508(d)(2)(iii) (LexisNexis 2015) ............14

Md. Code Ann., State Pers. & Pens. § 2-509.1 (LexisNexis 2015).. 6, 16, 20, 26, 28

Md. Code Ann., State Pers. & Pens. § 2-509.1(1)(ii) (LexisNexis 2015) ...............14

Md. Code Ann., State Pers. & Pens. § 2-509.1(b) (LexisNexis 2015)....... 11, 12, 13

Md. Code Ann., State Pers. & Pens. § 2-509.1(d)(1)(ii) (LexisNexis 2015) ..........14

Md. Code Ann., State Pers. & Pens. § 2-509.1(f)(2)(i) (LexisNexis 2015) ............14

Md. Code Ann., State Pers. & Pens. § 34-101(c) (LexisNexis 2015) .....................13

Md. Code Ann., State Pers. & Pens. § 8-102(a) (LexisNexis 2015) ........................4

Md. Code Ann., State Pers. & Pens. § 8-102(b) (LexisNexis 2015) ........................4

Md. Code Ann., State Pers. & Pens. § 8-108(c) (LexisNexis 2015) ........................4

**Rules**

Fed. R. Civ. 54(b).................................................................................. 19, 32

Fed. R. Civ. P. 56(a).................................................................................25

**Miscellaneous**

Congressional Budget Office, *A Detailed Description of CBO's Cost Estimate for the Medicare Prescription Drug Benefit* (July 2004) ....................................6

Public Employees' and Retirees' Benefit Sustainability Commission, 2010 Interim Report (Jan. 2011)..................................................................8

No. 23-2135

———————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————————

### KENNETH FITCH, *et al.*,

*Plaintiffs-Appellants*,

v.

### STATE OF MARYLAND, *et al.*,

*Defendants-Appellees*.

———————————————

On Appeal from the United States District Court for the District of Maryland
(Peter J. Messitte, District Judge)

———————————————

### BRIEF OF APPELLEES

———————————————

In *AFSCME Md. Council 3 v. Maryland*, 61 F.4th 143 (2023), this Court rejected a union's assertion that certain provisions of Maryland's State Personnel and Pensions Article gave rise to a contract between state employees and the State relating to retiree prescription drug benefits. This case, which involves individual plaintiffs (the "Fitch plaintiffs") rather than a union, presents the same issue. Indeed, for all intents and purposes, this is the same case. The district court recognized this, and despite having concluded in 2021 that the State was bound by contract to provide

prescription drug benefits to retirees, properly concluded that this Court's 2023 *AFSCME* decision was now controlling as to all the Fitch plaintiffs' claims. Because the Fitch plaintiffs have failed to show why *AFSCME* is not controlling, and because they have failed to present any reason why this Court should otherwise revisit the *AFSCME* decision, this Court should affirm the decision of the district court.

## ISSUE PRESENTED FOR REVIEW

Should this Court decline to revisit its decision in *AFSCME Md. Council 3 v. Maryland*, 61 F.4th 143 (2023), in which this Court concluded unequivocally that the statutory language of Maryland's State Personnel and Pensions Article did not give rise to a contract relating to retiree prescription drug benefits?

## STATEMENT OF THE CASE

**Maryland's State Employee and Retiree Health and Welfare Benefits Program**

In 1966, the Maryland General Assembly enacted a plan through which the State contributed a flat $1.5 million annually to fund state employee health benefits. 1966 Md. Laws ch. 660 (then-codified at Md. Ann. Code art. 64A, § 48). This statutory scheme did not specify either how the program was to be administered or the nature and extent of the benefits to be provided.

Almost 20 years later, in 1984, the State extended statutory coverage for state employee health benefits to include retiree health benefits. 1984 Md. Laws ch. 290

(then-codified at Md. Ann. Code art. 64A, §§ 48B, 48C). The 1984 legislation, which applied generally to all retirees (even those who had retired before the law went into effect), adopted a formula pegging a state retiree's eligibility for the subsidy to the retiree's years of service:

> A beneficiary and their designated beneficiaries are eligible to receive the subsidy provided by the State for the cost of the Program on the following basis:
>
> (i) If a beneficiary had at least 5 years of creditable service, the beneficiary and their designated beneficiaries shall receive five-sixteenths of the subsidy provided to a State employee;
>
> (ii) In addition, if a beneficiary had more than 5 but less than 16 years of creditable service, the beneficiary and their designated beneficiaries shall receive one-sixteenth of the subsidy for each year of creditable service that is more than 5 but less than 16 years.
>
> (iii) If a beneficiary had 16 years or more of creditable service, the beneficiary and their designated beneficiaries shall receive the same subsidy that is provided to a State employee.

1984 Md. Laws ch. 290, p. 1805 (then-codified at Md. Ann. Code art. 64A, § 48B(c)(1), now codified in substantively similar form at Md. Code Ann., State Pers. & Pens. § 2-508(b)(4) (LexisNexis 2015)). As with state-employee health benefits, the legislation did not specify either the amount or level of the state-retiree subsidy or the benefits that would be provided to retirees.

In 1993, the General Assembly recodified the provisions for state employee and retiree health benefits, 1993 Md. Laws ch. 10, and added language formally

establishing the program.[1]  For the first time, the statutory scheme set forth the "scope of [the] program" and gave broad discretion to the Secretary to "include the health insurance benefit options established by the Secretary [of Budget and Management]" and "any other benefit option that the Secretary considers appropriate."  1993 Md. Laws ch. 10, p. 761-62 (then-codified at State Pers. & Pens. § 8-102(b)).  Although the 1993 legislation retained the reference to a state "subsidy" (and provisions for retirees' eligibility), it did not address the amount of the subsidy or the benefits to which that subsidy might be applied.  1993 Md. Laws ch. 10, p. 769-70 (then-codified at State Pers. & Pens. § 8-108(c)).

During this period, Maryland began providing prescription-drug benefits to both active employees and retirees under the broad legislative delegation of authority to the Secretary.  But although the specific benefits and terms of the benefit have varied throughout the years, and other than being recodified in 1996 to its current location at Title 2, subtitle 5 of the State Personnel and Pensions Article, 1996 Md. Laws ch. 347, the program remained substantively unchanged until the events in 2004 described below.

---

[1] "There is a State Employee and Retiree Health and Welfare Benefits Program, to be developed and administered by the Secretary [of Budget and Management]," 1993 Md. Laws ch. 10, p. 761 (then-codified at State Pers. & Pens. § 8-102(a)).

**Congress Enacts Medicare Part D and Federally Financed Retiree Prescription-Drug Benefits, but with the "Doughnut Hole"**

In 2003, Congress enacted the Medicare Modernization Act, which created Medicare Part D, a federal program for retiree prescription-drug benefits that took effect on January 1, 2006.  For the first time, retirees who had attained the age of 65 would be eligible to obtain outpatient prescription-drug coverage by enrolling in one of the plans offered under Medicare Part D and making the premium payments required under the selected plan.  As enacted, the Medicare Part D program included four phases:  (1) an initial deductible phase, where the participant would be responsible for the entire cost of drugs; (2) an initial coverage phase, where, after exceeding the deductible (originally set at $250), participants would pay only a 25% coinsurance for drugs up to an "initial coverage limit" (originally set at $2,250); (3) a coverage gap, known colloquially as the "doughnut hole," whereby participants would no longer receive any coverage; and (4) a "catastrophic" phase, where coverage would resume once a participant's out-of-pocket expenses reached a higher level (originally set at $3,600), and participants would pay only a 5% coinsurance,[2] Congressional Budget Office, *A Detailed Description of CBO's Cost Estimate for*

---

[2] This is the structure of the Medicare Part D "standard benefit" package. Although the individual plans offered by private insurers under Part D must provide a benefit structure that is at least "actuarially equivalent" to this structure, private insurers may offer plans that are more generous (but that are usually accompanied by a higher monthly premium).

*the Medicare Prescription Drug Benefit*, at viii (July 2004).[3]  During the initial coverage phase, the selected Part D plan (which would receive subsidies from the federal government) would cover the 75% of the costs of the drugs not covered by the plan recipient.  But when a recipient reached the catastrophic phase, the federal government would incur 80% of the costs of the prescription drugs (with the plan covering the remaining 15%).  The legislation also provided a federal subsidy for low-income participants so that these individuals paid relatively few costs, even as they passed through the "doughnut hole" coverage gap.

### Maryland General Assembly Reacts to the Passage of Medicare Part D

Motivated by concerns over the limitations of Medicare Part D at its initial roll-out, in particular the gap in coverage encompassed by the "doughnut hole," the General Assembly enacted legislation directing that, "notwithstanding the enactment of [Medicare Part D]," the State "shall continue to include a prescription drug benefit plan in the health insurance benefit options" available to retirees.  2004 Md. Laws ch. 296 (codified at State Pers. & Pens. § 2-509.1). The legislation did not, however, define a "prescription drug benefit plan" nor mandate any specific level or type of benefits be provided in any such plan.

---

[3] Available at https://www.cbo.gov/sites/default/files/108th-congress-2003-2004/reports/07-21-medicare.pdf.

**Congress Enacts the Affordable Care Act, Which Closes the "Doughnut Hole" by 2020**

On March 23, 2010, President Obama signed into law the Affordable Care Act. Among other things, the Affordable Care Act altered Medicare Part D to eliminate the "doughnut hole" coverage gap by 2020, thus reducing costs to Part D participants with relatively high drug utilization. In other words, instead of having no coverage within the "doughnut hole," participants would, as of 2020, pay the same coinsurance for prescription drugs (i.e., 25%) as during the initial phase, until reaching the catastrophic phase (where, as under the original plan, Part D recipients would pay a 5% coinsurance).[4] Thus, from the participant's perspective, under the standard benefit there would be no change in cost responsibility when out-of-pocket costs exceeded the initial coverage phase and the participant entered what had formerly been the coverage cap. From a funding perspective, the Affordable Care Act accomplished this result by increasing manufacturer rebates and federal government subsidies.

**Facing "Unsustainable" Growth of Its Employee and Retiree Benefits Costs, Maryland Considers Benefits Reform**

Also in 2010, the Maryland General Assembly convened a "Public Employees' and Retirees' Benefit Sustainability Commission" to evaluate the fiscal

---

[4] The Affordable Care Act "closed the doughnut hole" gradually by reducing the percentage of costs for which a participant would be responsible each year until the percentage reached 25% as of 2020.

health of Maryland's state employee pension and benefits system and, pertinent to this case, the affordability of its current retiree health and prescription-drug plans. *See* Public Employees' and Retirees' Benefit Sustainability Commission, 2010 Interim Report, at iii (Jan. 2011) ("2010 Interim Commission Report") (J.A. 247).[5] The Commission noted that costs for employee and retiree benefits, including health benefits, were "growing much faster than the State's general fund revenues" and therefore were "unsustainable." (J.A. 253). The Commission stated that "[t]hese trends cannot continue without imposing very significant cuts in other vital State programs and employee compensation." (J.A. 253).

The Commission evaluated several ways to save costs, including with respect to health insurance for *active* employees and state *pension* costs. Pertinent to this appeal, the Commission also focused on the costs of providing *retiree* health benefits. And the Commission not only considered the raw annual costs of providing these benefits, but how these costs could impact the State's fiscal health in the long term. In 2004, the Governmental Accounting Standards Board ("GASB") had changed the accounting standards that govern the way in which state and local governments account for and report the fiscal liabilities associated with providing retiree health benefits and other non-pension post-employment benefits. (J.A. 278).

---

[5] The 2010 Interim Commission Report is available in the joint appendix at J.A. 245-330.

8

Instead of reporting those obligations as an annual liability, the new standards required governments to report the present value of the cost of providing those benefits into the future.  (J.A. 278).

As it stood for Maryland in 2010, the present value of providing retiree health benefits was calculated at $15.9 billion.  (J.A. 279).  The practical effect of this figure was that, to comply fully with the GASB standards and avoid showing significant liabilities on its books, the State would be required to prefund these liabilities through an Annual Required Contribution, rather than simply pay for the costs as they were incurred.  (J.A. 278-279).  And to meet that obligation for fiscal year 2011, the State would be required to incur not only $379 million in *actual* retiree health costs, but would also be required to dedicate another nearly $850 million to account for *future* costs (for a total Annual Required Contribution of $1.2 billion).  (J.A. 279, J.A. 285).

Although the GASB standards do not have the force of law, it has long been state policy to follow those standards.  (J.A. 278).  And more importantly, state compliance with the GASB standards is considered by bond rating agencies in evaluating States' creditworthiness.  (J.A. 278).  The Commission thus recognized that the failure to reduce retiree healthcare costs "may endanger the State's AAA bond rating, resulting in higher costs to borrow money for important infrastructure projects and other State needs."  (J.A. 283).

To address these funding shortfalls, the Commission suggested several changes for the retiree health benefits program.    First, the Commission recommended that the State, through the regulatory process, implement the same structural plan design changes for retirees as it had recommended for active employees.  (J.A. 283).  Second, the Commission recommended several statutory changes regarding retiree eligibility: (1) that employees with less than 15 years of creditable service as of June 30, 2010, (a) should be required to earn 15 years of service credit (up from five) to qualify for participation in the state health insurance plan, and (b) should be required to earn 25 years of service credit with the State (up from 16) to qualify for the maximum premium subsidy (with the subsidy prorated for those between 15 and 25 years of service); and (2) that employees should, in the future, be required to retire directly from state service in order to qualify for retiree health benefits.[6]  (J.A. 283-284).  Finally, and pertinent to this case, the Commission "recommend[ed] that the State establish in statute a requirement that, by the year 2020, all Medicare-eligible State retirees must join Medicare Part D for prescription drug coverage[.]"  (J.A. 284).

---

[6] The General Assembly did not adopt these recommendations as proposed; instead, as discussed *infra*, the Legislature changed the eligibility requirements only for those employees who began service after July 1, 2011.

The Commission also broke down the effect of the proposed changes on the State's liabilities for other non-pension post-employment benefits. As a chart in the report demonstrates, among the proposed options, by far the largest reduction in unfunded liabilities ($5.5 billion) and the Annual Required Contribution ($420 million) would be from "shift[ing] all medicare-eligible retirees to Medicare Part D in 2020." (capitalization adjusted). (J.A. 285).

### With the "Doughnut Hole" Closing, the General Assembly Enacts Legislation to Transition Retirees to Federally Provided Prescription-Drug Benefits

In 2011, the General Assembly acted on several—but not all—of the Commission's cost-saving recommendations. Pertinent to this case, the 2011 legislation adopted the Commission's recommendation to realize billions in cost-savings by ending the retiree prescription-drug program in fiscal year 2020, which in Maryland began on July 1, 2019.[7] 2011 Md. Laws ch. 397. Instead, consistent with the Commission's understanding that Part D would provide substantively equivalent benefits, all Medicare-eligible retirees would, on that date, be required to transition to obtaining their prescription drugs directly through the Medicare Part D program. Again, this change was projected to save $420 million in annual and

---

[7] "The State shall discontinue prescription-drug benefits for Medicare-eligible retirees in fiscal year 2020," 2011 Md. Laws ch. 397, p. 2310 (codified at State Pers. & Pens. § 2-509.1(b)).

structural costs, and would erase more than $5.5 billion of unfunded liabilities from the State's books for accounting purposes.  (J.A. 285).

### The Federal Government Accelerates the Closing of the "Doughnut Hole," and the State Follows Suit

By 2018, the federal government had enacted new measures that required manufacturers to provide increased discounts in the Medicare program, which had the result of accelerating the closure of the "doughnut hole" to January 1, 2019, i.e., six months earlier than initially projected.  *See* Bipartisan Budget Act of 2018, codified in relevant part at 42 U.S.C. § 1395w-114A.  On April 5, 2018, the General Assembly adjusted Maryland's plan accordingly by enacting legislation that moved up to January 2019 the date by which all Medicare-eligible retirees would transition to receiving benefits directly from Part D.  2018 Md. Laws ch. 10 (codified at State Pers. & Pens. § 2-509.1(b)).   The legislation required the Department of Budget and Management to notify retirees of the six-month change in the transition period, 2018 Md. Laws ch. 10, which it did in a series of three mailings in May, June, and July of 2018.

### The Fitch Plaintiffs File Suit, and the District Court Enjoins the State's Plan to Discontinue Retiree Prescription-Drug Benefits

On September 10, 2018, the Fitch plaintiffs—a group comprised mostly of state retirees—filed suit in the Circuit Court for Baltimore City and sought preliminary injunctive relief.  The complaint alleged that the planned transition to

Medicare Part D violated the retirees' contractual and constitutional rights under the Contract Clause, Takings Clause, and Equal Protection Clause of the United States Constitution to receive state-funded retiree prescription-drug benefits.[8]  After the State removed the case, the district court entered a preliminary injunction barring the State from discontinuing prescription-drug benefits for retirees and their dependents as set forth in State Personnel & Pensions Article § 2-509.1(b).  (J.A. 10; ECF 31).  In accordance with the preliminary injunction, which has since been dissolved, the State continued to provide prescription-drug benefits through the state-administered program to all otherwise-eligible retirees.

### Maryland Enacts Legislation Supplementing Retiree Prescription-Drug Benefits Available Under Medicare Part D

In its 2019 session, the Maryland General Assembly enacted three new prescription-drug benefit programs to replace the previously provided benefit if the injunction in this case were to be dissolved.  2019 Md. Laws ch. 767 (effective May 25, 2019).  Only two of these programs are relevant to this case.[9]

---

[8] The Fitch plaintiffs also asserted contractual and constitutional claims against the State relating to the management of the Postretirement Health Benefits Trust Fund, a statutorily created fund formed "to assist the State in financing the postretirement health insurance subsidy."  State Pers. & Pens. § 34-101(c).  The district court rejected those claims (J.A. 353-354), and the Fitch plaintiffs have not pursued those claims on appeal.

[9] The irrelevant program—the Maryland State Retiree Catastrophic Prescription Drug Assistance Program—is available to retirees who entered into state service on or before June 30, 2011 and retire on or after January 1, 2020.  2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(1)(ii)).  Because the

The first—the Maryland State Retiree Prescription Drug Coverage Program —was made available to those retirees who "retired on or before December 31, 2019," 2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(d)(1)(ii)). Under this program, a Medicare-eligible retiree's out-of-pocket costs will be capped at the same level as a non-Medicare-eligible retiree's out-of-pocket costs, which is currently set forth in statute as $1,500 for individuals and $2,000 for families. 2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(d)); *see also* State Pers. & Pens. § 2-508(d)(2)(iii). In other words, the maximum that a retiree would pay for prescription drugs during a plan year would be $1,500 (or $2,000 for the retiree and family).

The other program—the Maryland State Retiree Life-Sustaining Prescription Drug Assistance Program—reimburses retirees for any out-of-pocket costs for life-sustaining medications that are covered through the State's health insurance benefit options but are not covered under the Medicare Part D program in which the retiree is enrolled. 2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(f)(2)(i)).

The 2019 legislation specified that these programs would not be implemented unless and until at least 11 months after the injunction in this case is dissolved. 2019

---

Fitch plaintiffs all retired prior to January 1, 2020, this program is inapplicable to them.

Md. Laws ch. 767, § 2.  As discussed below, these programs are set to be implemented in January 2025.

### AFSCME Intervenes in the Litigation

The addition of these supplemental benefit options prompted AFSCME Maryland Council 3 ("AFSCME") to intervene in this litigation.  (J.A. 14; ECF 91).  As a union representing many *active* state employees, AFSCME alleged that the offering of these supplemental programs forced upon some of its members a difficult choice:  retire before the end of 2019 and continue receiving benefits similar to those they had received as employees, or continue working and risk receiving less generous benefits if the changes to the State's program were upheld.  As with the Fitch plaintiffs' complaint, AFSCME presented claims that were grounded in both contract and constitutional theories.

### The District Court's Initial Decision on the State Law Breach of Contract Claims[10]

On August 13, 2020, the State moved to dismiss the operative complaints of both the Fitch plaintiffs and the AFSCME plaintiffs.  (J.A. 19; ECF 140).  On

---

[10] The Fitch plaintiffs also asserted claims under the Contracts Clause of the United States Constitution.  The district court dismissed these claims as to all parties.  First, as to those plaintiffs that fell outside of the scope of contract as found by the district court, the court dismissed their federal Contract Clause claims on the simple basis that they lacked a contractual relationship that could be impaired.  (J.A. 348-349).  As to those plaintiffs for which the district court concluded a contract existed (i.e., the Fitch plaintiffs here), the district court dismissed those claims on the basis that those retirees were not entitled to maintain a federal claim because they were

December 30, 2021, the district court denied the State's motion in part and granted it in part. (J.A. 332-356). The district court first concluded that State Personnel & Pensions §§ 2-508 and 2-509.1 together conferred upon state retirees a contractual right to prescription-drug benefits. As to the mechanics of the contract, the district court interpreted those statutory provisions as "creat[ing] a unilateral contract that became binding upon the fulfillment by the retirees of specific conditions." (J.A. 340). The district court then articulated those specific conditions upon which the right to prescription-drug benefits would "vest": "the person must have (1) commenced service on or before June 30, 2011, (2) must be actually retired, and (3) must have accrued at least 5 years of 'creditable service' (or be retired on disability as of that date)." (J.A. 343). Based on those conditions, the district court divided the plaintiffs into four groups and discussed the impact on its conclusion on each:

### Active Employees

Applying a "plain meaning" analysis to State Personnel & Pensions §§ 2-508 and 2-509.1, the district court concluded that, "whatever right those statutes grant, it extends only to retirees." (J.A. 347). In other words, the district court determined that "[State Personnel & Pensions] § 2-508 makes retirement before June 30, 2011,

---

able to pursue a state law breach of contract claim. (J.A. 350 ("Where a litigant maintains 'the right to recover damages for breach of contract, there is no impairment of contract under the Contract Clause.'" (citing *Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366, 371 (4th Cir. 2014)).)

with at least 5 years of creditable service, necessary conditions for entitlement to the benefit." (J.A. 348). The district court therefore concluded that active employees (i.e., the AFSCME plaintiffs) fell outside of the contractual promise embodied in those statutes.

### Employees Who Retired on or Before June 30, 2011

According to the district court, because those employees who retired on or before June 30, 2011 had retired before the State had announced, through Chapter 397 of the 2011 Laws of Maryland, that it was discontinuing prescription-drug benefits as of fiscal year 2020, these retirees—the Fitch plaintiffs here—fell squarely within the scope of the contract and thus would be entitled to maintain their breach of contract claims. (J.A. 349-350).

### Employees Who Retired Between July 1, 2011, and December 31, 2018

The district court concluded that, because the State (through Chapter 397 of the 2011 Laws of Maryland) had discontinued retiree drug benefits as of fiscal year 2020 (rather than immediately upon the law's enactment), employees who retired during this period "retained a vested contractual right to at least some drug benefit subsidy until at least the beginning of fiscal year 2020 (i.e., July 1, 2019), a date later advanced to January 1, 2019." (J.A. 351).

17

### Employees Who Retired on or After January 1, 2019

The district court concluded that this class of individuals "would be entitled to the same benefits promised to them as of January 1, 2019—no more, no less." (J.A. 352). And because, as of that date, the State had discontinued prescription-drug benefits for retirees, the district court concluded that they had no right to any such benefits. (J.A. 352-353).

### State Permitted to Show Reasonable Modification to Contractual Rights

As part of its ruling, the district court noted that, under Maryland case law, notwithstanding the existence of a contract, "the State is still allowed to make reasonable modifications to the contractual rights of its retirees." (J.A. 345 (citing *City of Frederick v. Quinn*, 35 Md. App. 626, 630-31 (1977).) Thus, although it denied the State's motion to dismiss as to any plaintiff who retired on or before June 30, 2011 (and, to a more limited extent, those who retired between July 1, 2011, and December 31, 2018), the district court acknowledged that the State should nonetheless be afforded an opportunity to show that the programs embodied in Chapter 767 of the 2019 Laws of Maryland constituted "reasonable modifications" to those retirees' contractual rights.[11]  (J.A. 345-346).

---

[11] On the other hand, because the district court concluded that the active employees (and those who retired on or after January 1, 2019) had no contractual rights to retiree prescription-drug benefits, no "reasonable modification" analysis

**The District Court's Decision on the Takings Clause Claims**

Also before the district court were plaintiffs' Taking Clause claims. As to those plaintiffs that the district court determined not to have a contractual relationship with the State, the district court dismissed their Takings Clause claims because, without a valid contractual entitlement, they lacked any cognizable property interest that fell within the protection of the Takings Clause. (J.A. 348, J.A. 353). As for those plaintiffs who had been determined to have a valid contractual claim, the district court, citing this Court's precedent, held the Takings Clause claims in abeyance pending resolution of the contract claims. (J.A. 350 (citing *Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366, 374 n.6 (4th Cir. 2014)).)

**This Court's Decision in *AFSCME Md. Council 3 v. State of Maryland***

As noted above, in its 2021 decision the district court dismissed the claims of active employees because the court concluded that those employees were not covered under the terms of the contract as found by the district court. Invoking Federal Rule of Civil Procedure 54(b), the district court entered a final order of judgment as to its dismissal of the claims of active employees (J.A. 21; ECF 164), to which AFSCME noted an appeal to this Court (J.A. 359-360).

---

with respect to those plaintiffs would be necessary, thus allowing those plaintiffs' claims to be dismissed outright.

On February 21, 2023, this Court issued its decision on AFSCME's appeal. *AFSCME Md. Council 3 v. State of Maryland*, 61 F.4th 143 (2023). Although this Court acknowledged that a statute could give rise to a contractual relationship if "both [the contract's] existence and the authority to make it . . . clearly and unmistakably appear [in the statutory language]," this Court concluded that the statutes involved here did "not include any unmistakable contract language," and thus, as a general matter, "do not create a contract between the State of Maryland and its employees or retirees." *Id*. at 149-51. First, this Court concluded that these statutes did not use the language of contract, and instead merely set forth state policy. *Id*. at 150. Moreover, this Court concluded that these statutes failed to satisfy Maryland's "general contract standard," in that they were not "sufficiently definite" and did "not define the type or amount of benefits that will be available to a retiree[.]" *Id*. at 151. In other words, although this Court affirmed the district court's judgment that the active employees did not have a contract with the State for prescription-drug benefits in retirement, it did so not on the basis that the active employees fell outside of the terms of an otherwise-extant contract (as the district court had determined), but because no such contract existed for any state employee or retiree. *See id*. ("We hold that Sections 2-508 and 2-509.1 do not create a contract between the State of Maryland and its employees or retirees.").

### Post-*AFSCME* Proceedings in the District Court

On February 24, 2023, the State moved for summary judgment on the basis that this Court's holding in *AFSCME* that Maryland law did not create a contract relating to state retiree prescription drug benefits was dispositive as to all of the Fitch plaintiffs' claims.  (J.A. 427-459).

On March 22, 2023, the district court issued an order in which it asked the parties to "assum[e] Defendant's argument is well-taken," and to respond to the following questions:

- What would be the immediate impact of granting Defendants' Motion for Summary Judgment?

- Would drug benefits to current or former state employees cease immediately?

- Would there be a legal basis for establishing a transition period?

- If Plaintiffs were [to] lose and appeal, would there be a legal basis for a stay?

(J.A. 484).  The State responded that, other than the inherent legal consequences (i.e., a judgment in favor of the State and dissolution of the preliminary injunction), there would be no immediate impact of granting the motion.  (J.A. 485-490).  In short, this was because the 2019 legislation discussed above included a provision stating that the elimination of the state prescription drug benefits program would not occur until "the first day of the second State health benefits plan year immediately following the" "final resolution" of the injunction issued by the district court.  2019

21

Md. Laws ch. 767 § 2.  In other words, if (as ultimately occurred) the injunction were to be dissolved in July 2023, the retiree prescription benefits would not be discontinued immediately, or the following year (i.e., January 2024), but the year after that (i.e., January 2025).[12]

On June 29, 2023, the district court held a hearing on the motion for summary judgment.  (J.A. 737).  The proceedings focused primarily on the impact of this Court's decision in *AFSCME.*  Nonetheless, during the proceedings the Fitch plaintiffs claimed that there were "outstanding questions of fact that do remain that the Court would have to settle."  (J.A. 754).  When the district court responded that this Court's decision that there was no contract removed any "legal basis to claim anything," counsel explained that she was asserting allegations of "fraud," ostensibly based on the theory that retirees had already paid for benefits that they ultimately did not receive.  (J.A. 754).

On July 19, 2023, the district court issued a memorandum opinion concluding that it was "bound by the Fourth Circuit's decision in *AFSCME Maryland Council 3*, which held that no contract exists."  (J.A. 512).  Although the district court ordered that the preliminary injunction be dissolved, the court stated that it was deferring action on the motion for summary judgment.  (J.A. 513).  Instead, the district court

---

[12] The mechanics of this provision are more fully explained at J.A. 486-487.

acknowledged that "Plaintiffs' counsel asserted at the June 29 Motions Hearing that alternative causes of action for fraud or perhaps restitution might be justified based on the theory that Plaintiffs have paid in advance for benefits that they never received," and gave the Fitch plaintiffs time "to submit additional briefing on such claims." (J.A. 513).

The Fitch plaintiffs thereafter filed a memorandum that presented new claims of fraud based on various theories. For instance, the Fitch plaintiffs claimed that the State committed fraud by failing to notify them that retiree prescription drug benefits would end in fiscal year 2020—notwithstanding that the General Assembly's enactment of the 2011 legislation effectuating that result was, like any other duly-enacted law, notification in and of itself. And the Fitch plaintiffs asserted for the first time one of the claims they assert here on appeal: that they were entitled to a "fringe benefit" in the form of a dedicated state contribution for retiree health benefits that "was paid forward just like for the pension benefit." (J.A. 518).

On September 29, 2023, the district court granted summary judgment in favor of the State. First, as it had done in its July 19, 2023 opinion dissolving the preliminary injunction, the district court reiterated that the Fitch plaintiffs' original claims—i.e., those asserting that the State was contractually bound to provide retiree prescription drug benefits—were foreclosed by this Court's decision in *AFSCME* (J.A. 1263-1264). The district court also rejected the Fitch plaintiffs' "alternative

new fraud claims." (J.A. 1264 (capitalization adjusted).)   The district court acknowledged that "the proper procedure would be for Plaintiffs to amend their Complaint to give Defendants a fair opportunity to answer these new claims." (J.A. 1264-1265).  Yet the district court nonetheless concluded that, because these new claims lacked merit, any attempt by the Fitch plaintiffs to amend their complaint would be futile. (J.A. 1265).  Not only did the district court conclude that the Fitch plaintiffs "could not plausibly make out a claim for fraud on the part of the State," but that any such claims would be barred by Eleventh Amendment immunity. (J.A. 1264-1267).

## SUMMARY OF ARGUMENT

The sole issue in this case is whether the State of Maryland has a contractual obligation to provide prescription drug benefits to Medicare-eligible state retirees. This issue, however, was already decided by this Court in *AFSCME Md. Council 3 v. Maryland*, 61 F.4th 143 (2023), and that case is controlling here.

The Fitch plaintiffs' attempts to explain why *AFSCME* is not controlling are without merit.  Their claims that this Court failed to consider various theories and arguments is belied by the record and this Court's opinion.   And their attempts to inject extraneous new claims into this case fall on both substantive and jurisdictional grounds.

## ARGUMENT

### I. THE STANDARD OF REVIEW IS DE NOVO.

This Court "review[s] a summary judgment award de novo, 'based on [its] independent review of the entire record.'" *Bellon v. PPG Emp. Life & Other Benefits Plan*, 41 F.4th 244, 251 (4th Cir. 2022) (citations omitted). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id*. (quoting Fed. R. Civ. P. 56(a)).

### II. THIS COURT SHOULD DECLINE TO REVISIT ITS DECISION IN *AFSCME MD. COUNCIL 3 V. MARYLAND*, 61 F.4TH 143 (2023), WHICH IS CONTROLLING IN THIS CASE.

The "dispositive" issue that the Fitch plaintiffs have put before this Court is whether, in enacting certain provisions of the State Personnel and Pensions Article, Maryland created a contract with its employees with regard to retiree prescription drug benefits.  Appellants' Br. 18 ("The dispositive issue in this case is one of statutory contract creation, i.e., was a contract created.").  This Court has already answered that question:  "We hold that Sections 2-508 and 2-509.1 do not create a contract between the State of Maryland and its employees and retirees."  *AFSCME*, 61 F.4th at 151.  Because, as the district court recognized, *AFSCME* is controlling here, this Court should affirm the judgment of the district court.

In their brief, however, the Fitch plaintiffs advance a mashup of reasons why this Court should revisit its decision in *AFSCME*. As a preliminary matter, this attempt should be rejected outright. This Court's published decision in *AFSCME*, issued less than a year ago, "is binding on other panels unless it is overruled by a subsequent en banc opinion of the court or a superseding contrary decision of the Supreme Court." *Planned Parenthood S. Atl. v. Kerr*, 27 F.4th 945, 953 (4th Cir. 2022) (citation omitted). Nonetheless, as explained below, none of the reasons advanced by the Fitch plaintiffs has merit.

### A.    This Court in *AFSCME* Evaluated—and Rejected—the Existence of a Contract Using Principles of Maryland Law.

The Fitch plaintiffs first assert that this Court's decision in *AFSCME* should be revisited because "[t]he *AFSCME* Court did not defer to the Maryland laws outlining statutory construction to determine whether the statutes in question created a contract between Maryland and the Fitch Retirees, making the decision in *AFSCME* not applicable to this case." Appellant's Br. 19. But that is not true on many levels. First, contrary to the Fitch plaintiffs' assertions, in its opinion this Court stayed true to Maryland principles of statutory construction and looked primarily to legislative intent through the plain language of the statutory scheme. *See AFSCME*, 61 F.4th at 149 ("In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." (citation omitted)). And

in "[r]eviewing the language of [§§ 2-508 and 2-509.1]" under these principles, this Court had "little trouble concluding that they do not create a contract binding upon the State." *Id*. at 150.

The Fitch plaintiffs' contentions also ignore the fact that this Court in *AFSCME* evaluated the question of whether a contract existed "under Maryland's general contract standard." *Id*. at 151 (noting that, under Maryland law, "[a]n enforceable contract must express with definiteness and certainty the nature and extent of the parties' obligations" (citation omitted)). And this Court concluded that the statutes at issue did "not meet that standard because [they] do not define the type or amount of benefits that will be available to a retiree, nor does it prevent the legislature from making future changes." *Id*.

Likewise, this Court rejected the notion that the statutes' use of the term "shall" reflected a legislative intent to bind the State in contract. Appellants' Br. 21. Although this Court noted that the use of the term "shall" did create obligations on behalf of the State, this Court noted that these obligations were binding only so long as the statute remained in force. *AFSCME*, 61 F.4th at 150. In other words, absent language expressly establishing a contractual relationship, such statutory commands amounted only to a "policy" that could be changed at the Legislature's later election. *Id*.

Moreover, as this Court recognized, the scope of its decision was not limited to whether a contract existed between the State and *active* employees (i.e., those represented by AFSCME). Instead, this Court's decision was plainly premised on the lack of *any* contract between the State and *any* of its employees, current or retired. *See id*. at 146 ("Specifically at issue here is whether Maryland contracted, through statute, to provide retirees with prescription drug benefits as part of their retirement subsidy."). Thus, this Court's analysis related to the issue of whether, *as a general matter*, there was a contract relating to retiree prescription drug benefits, leaving nothing to indicate (either explicitly or implicitly) that its decision was limited only to the then-active employees represented by AFSCME.

These principles apply equally to the Fitch plaintiffs' assertion that "[t]he AFSCME Court decision only reviewed §§ 2-508 and 2.509.1 exclusively for language that could create a bilateral contract," and not whether this statutory scheme "create[d] a unilateral statutory contract." Appellants' Br. 22-23. Indeed, nowhere is this distinction ever made in this Court's decision. In fact, in the beginning of its opinion, this Court announced, without qualification, its conclusion "that the statutory language does not create a contract with state employees." *AFSCME*, 61 F.4th at 146. But what is telling is that, immediately before this statement, this Court expressly acknowledged the district court's conclusion that, although "Maryland law created a contract, . . . the contract was unilateral in nature."

*Id*. at 145-46.  There can thus be no doubt that this Court's broad pronouncement that no contract *of any type* was created included the conclusion that no *unilateral* contract was created.

Finally, the Fitch plaintiffs claim that this Court failed to address the assertion that their contractual entitlement to retiree prescription benefits had "vested" because their years of service had placed them within the category of individuals "entitled" to benefits by the statutes at issue.  Appellants' Br. 25.  But the premise of this argument, as with their argument generally, is that a contractual obligation existed in the first place.  And as this Court (and the district court) concluded, no such obligation existed.  Accordingly, the Fitch plaintiffs are wrong to assert that this Court, and consequently the district court, failed to address this argument.

### B. The Fitch Plaintiffs' Claim of a Dispute of Material Fact is Illusory in Nature, and in Any Event Relates to a Claim Not Properly Before this Court.

In Section D of their brief, the Fitch plaintiffs claim that they "prepaid for their Retirement Health Insurance" and that "[t]his is a material fact that precludes entry of summary judgment in favor of Maryland by its very nature."  Appellants' Br. 24. This claim fails for several reasons.

First, as detailed above, this purported dispute of material fact relates to claims that were made for the first time—and in vague form at that—at the June 29, 2023 hearing on the motion for summary judgment.  As the district court recognized, the

Fitch plaintiffs' "alternative causes of action for fraud or perhaps restitution" were not made in their complaint, and therefore were not properly before that court. The Fitch plaintiffs' claims are in turn not properly before this Court, and should be rejected on that basis alone.

The only reason these claims are even being discussed here is that the district court deferred ruling on summary judgment and instead permitted the Fitch plaintiffs to more fully develop these "alternative causes of action for fraud or perhaps restitution" in additional briefing. (J.A. 513). And after that additional briefing, the district court concluded that these new theories lacked merit and, in any event, were barred by Eleventh Amendment immunity. (J.A. 1265-1266).

The district court was correct in its analysis. The Fitch plaintiffs' claims lack merit because they are based on the erroneous premise that the Fitch plaintiffs somehow prepaid for retiree health insurance. Instead, as even the Fitch plaintiffs' otherwise unsupported filings make clear, their allegations merely relate to the State's act of budgeting for the possibility that it might thereafter have to expend funds for these benefits. But the notion that there is some tangible and dedicated source of money is itself illusory, as Maryland has always funded retiree health benefits, including the prescription drug benefit, on a pay-as-you-go basis. (J.A. 279).

Finally, as the district court noted, these newly asserted claims all sound in tort and therefore run headlong into the Eleventh Amendment. "By 'draw[ing] upon principles of sovereign immunity,' the Supreme Court has 'construe[d] the [Eleventh] Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" *Pense v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019); *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 482 (4th Cir. 2005) ("[T]he essence of the immunity is that the State cannot be sued in federal court at all, even where the claim has merit[.]"). The district court properly applied this jurisdictional bar.

In sum, the Fitch plaintiffs' claim of a dispute of material fact is not only based on an erroneous premise, but also does not relate to the only claim that is properly before this Court: whether a contract existed between the State of Maryland and its employees relating to retiree prescription drug benefits. Accordingly, the Fitch plaintiffs' claim fails to provide a basis for disturbing the judgment of the district court.

### C.    To the Extent the Issue is Before This Court, the 2019 Laws Are Constitutional.

In their brief, the Fitch plaintiffs assert that the 2019 laws relating to additional prescription drug benefits are unconstitutional. Appellants' Br. 26-27. This claim was not addressed below, and it is unclear why it is being made here on appeal. Any

challenge to the 2019 laws would necessarily be premised on the success of the Fitch

plaintiffs' underlying claim that the statutes at issue created a contractual obligation

on the part of the State to provide retiree prescription drug benefits.  As articulated

in their brief, the Fitch plaintiffs' claim appears to be that, *if the State is contractually

obligated to provide retiree prescription drug benefits*, it cannot fulfill that

contractual obligation by substituting the programs set forth in the 2019 laws.  Yet

that claim is not properly before this Court, because the district court concluded that

the State was *not* contractually obligated to provide such benefits.  In other words,

if, as both this Court and the district court have concluded, the State is not

contractually obligated to provide retiree prescription drug benefits, the State does

not act unconstitutionally by providing the benefits conferred by the 2019 laws.[13]

---

[13] As noted above, before this Court issued the *AFSCME* decision, the parties were poised to litigate the question, under Maryland law, of whether the 2019 laws constituted a "reasonable modification" of the contractual obligation that the district court initially believed the State had created through §§ 2-508 and 2-509.1.  *See City of Frederick v. Quinn*, 35 Md. App. 626, 630-31 (1977) (noting that "[t]he contractual or vested rights of the employee in Maryland are subject to a reserved legislative power to make reasonable modifications in the plan, or indeed to modify benefits if there is a simultaneous offsetting new benefit or liberalized qualifying condition.").  It is this question that the Fitch plaintiffs appear to be addressing here.  But, as discussed above, this question is not before this Court because the district court's decision that no contract existed obviated the need for any court to conduct a "reasonable modification" analysis.

**D.    The Fitch Plaintiffs' Attempt to Revisit the Scope of this Court's Review in *AFSCME* Should be Rejected.**

As their final argument, the Fitch plaintiffs appear to challenge this Court's authority in *AFSCME* to have reviewed the district court's December 31, 2021 decision as to whether Maryland law gave rise to a contract relating to retiree prescription drug benefits.    Appellants' Br. 27-28.    But this Court properly determined that it had authority to review the district court's broad and foundational conclusion as to whether a contract existed:  "[The Rule 54(b)] certification here is a certification of the district court's *entire order* dismissing [AFSCME's] Complaint, including its conclusions that a unilateral contract existed but that active employees had no vested rights."    *AFSCME*, 61 F.4th at 148-49.    As with the *AFSCME* decision generally, this Court's ruling with respect to its scope of review is binding unless overruled by an en banc decision of this Court.    *See Planned Parenthood S. Atl.*, 27 F.4th at 953.

 In response, the Fitch plaintiffs refer to "findings of fact," and then assert the uncontroversial notion that such findings should be reviewed on appeal under a "clearly erroneous" standard.    Appellants' Br. 27.    But neither the *AFSCME* appeal nor this appeal presents questions of fact.    Instead, whether in *AFSCME* or this case, the question of whether Maryland law gave rise to a contractual obligation relating to retiree prescription drug benefits is a question of law.    In any event, regardless of the type of question presented, this Court's conclusion relating to its own scope of

review was not erroneous, and the Fitch plaintiffs have failed to present any reason why this Court's decision in *AFSCME* is not controlling here.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ryan R. Dietrich
_____

RYAN R. DIETRICH
Assistant Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7648
rdietrich@oag.state.md.us

Attorneys for Appellees

**REQUEST FOR ORAL ARGUMENT**

Appellees assert that oral argument is not necessary as it would not aid the Court in its disposition of this appeal.  As set forth above, the analysis and outcome in this case are governed entirely by this Court's recent decision in *AFSCME Md. Council 3 v. Maryland*, 61 F.4th 143 (2023).

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 7,788 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Ryan R. Dietrich
_____

Ryan R. Dietrich

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

|  |  |  |
|---|---|---|
|  | * |  |
| KENNETH FITCH, *et al.*, |  |  |
|  | * |  |
| *Plaintiffs-Appellants*, |  |  |
| v. | * | No. 23-2135 |
|  |  |  |
| STATE OF MARYLAND, *et al.*, | * |  |
|  |  |  |
| *Defendants-Appellees*. | * |  |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**CERTIFICATE OF SERVICE**

I certify that, on this 7th day of February, 2024, the Brief of Appellees was filed electronically and served on counsel of record who are registered CM/ECF users.

/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich